**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION**

NO: 7:06-CV-28-WW

| | | |
|---|---|---|
| NORTH CAROLINA JOINT | ) | |
| UNDERWRITING ASSOCIATION, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| DWIGHT C. LONG, *et. al.,* | ) | |
| | ) | |
| Defendants. | ) | |

_____

This Cause comes before the Court on the Defendants' Cross Motions for Summary

Judgment **[DE-64, 65, 67, 70, 75, & 76]** and Judgment on the Pleadings **[DE-62]** pursuant to Federal

Rules of Civil Procedure 56 and 12 (c). The underlying dispute in this case arises from competing

claims to insurance proceeds owned by Defendants Dwight C. Long and Kathy Y. Long. The

following Defendants assert claims against the proceeds: the United States Internal Revenue Service,

which holds a tax lien against all of the Longs' real and personal property; Ennis and Jeffrey Lewis,

secured creditors against Mr. Long's one-half interest in the residential property; International Loss

Services, a public adjusting company with a contractual assignment of the proceeds, and attorneys

Thomas S. Hicks and John A. High (through Hill & High L.L.P) who both seek to recover attorney's

fees for their assistance in procuring the insurance proceeds. For the reasons detailed below, the

Internal Revenue Service's Motion for Partial Summary Judgment **[DE-64 & 77]** is GRANTED,

the Lewises Motion for Judgment on the Pleadings **[DE-62]** is DENIED in part and GRANTED in

part, Kathy Y. Long's and Hill & High's Motion for Summary Judgment **[DE-65]** is DENIED in

part and GRANTED in part, International Loss Services' Motion for Summary Judgment **[DE-67]**,

is DENIED in part and GRANTED in part, and International Loss Services', Thomas S. Hicks', and

Dwight C. Long's Motions for Summary Judgment **[DE-70, 75, & 76 ]** are DENIED in part and

GRANTED in part.

## Statement of the Case

Dwight C. Long and Kathy Y. Long (hereinafter "the Longs") owned residential property

located in Bladen County, North Carolina. **[DE-71, pgs. 1-2]**.  For several years, the Longs failed

to pay their federal income taxes and, as a result, on September 29, 1997, the Internal Revenue

Service (hereinafter "the IRS") filed notice of a lien on all of the Longs' real and personal property.

Id. at 2.  After filing the lien, the Longs settled a property dispute with Ennis and Jeffrey Lewis

(hereinafter "the Lewises") by which the Longs acquired their residential property as tenants in

common. Id. at 3.  In addition, in order to satisfy an outstanding debt, the settlement also required

Mr. Long to execute a deed of trust with the Lewises as beneficiaries.  Id.  This deed of trust was

recorded on July 2, 2003 with a principal sum of $62,702.91. **[DE-63, pgs. 4, 5]**.

Under the terms of the deed of trust, Mr. Long was required to insure his one-half interest

in the residential property for the benefit of the Lewises. **[DE-65-6, p. 2]**.  Thus, on September 12,

2003, Mr. Long applied for a hazard insurance policy with the North Carolina Underwriting

Association (hereinafter "the NCJUA") covering the property from fire, wind, and hail. **[DE-71,
p.3]; [DE-72, Ex. 7]**.  However, he failed to list the Lewises as the "loss payees" in the contract;

2

thereby breaching the terms of their agreement. **[DE-71, p. 4]**; **[DE-63, p. 10]**. Several months later, on March 7, 2004, the residence was destroyed by fire. **[DE-71, p. 4]**.

After the fire, Mr. Long hired International Loss Services (hereinafter "ILS") to provide public adjusting services in preparation of his claim against the NCJUA. Id. Mr. Long's contract with ILS stipulated that if Mr. Long prevailed, ILS would receive twelve percent (12%) of the loss payable under the insurance claim. Id. In addition to ILS, Mr. Long also retained attorney Thomas S. Hicks to handle any legal issues that arose in the course of resolving his insurance claim. Id. It was agreed that Mr. Hicks would deduct his hourly fee from the insurance proceeds. Id. at 4-5. However, after investigating Mr. Long's claim, the NCJUA sent Mr. Long a notice that it would not make any payments to cover his loss. Id. at 5.

After Mr. Long notified his wife that the NCJUA would not reimburse them for their loss, Mrs. Long hired the law firm Hill & High L.L.P., to represent her interest in the fire insurance proceeds for her former marital residence. **[DE-66, p. 4]**. Both Mr. Hicks and Hill & High appealed the NCJUA's decision and appeared during a hearing conducted before the board of directors regarding their clients' claims to the insurance proceeds. Id. In August 2005, the NCJUA sent a letter to both parties indicating that their board of directors unanimously voted to reverse the decision voiding their insurance policy. Id. at 4-5; **[DE-71, p. 5]**. The policy limits were $200,000 for the structure coverage and $38,000 for the content coverage. **[DE-66, p. 5]**. To determine which parties were entitled to receive priority of the insurance proceeds, an interpleader action was filed in the North Carolina state court in Bladen County on February 9, 2006. Id. at 5. After the IRS received notice of the action, it removed the case to federal court. **[DE-1]**. In addition, the NCJUA deposited the insurance proceeds with the Court on July 18, 2007. **[DE-46]**. Each Defendant has

3

asserted arguments as to why their claim is entitled to priority over the other Defendants. The Court will address these arguments below.

## **Standard of Review**

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).[1] The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). The moving party can bear his burden either by presenting affirmative evidence, or by demonstrating that the non-movant's evidence is insufficient to establish his claim. Celotex, 477 U.S. at 331 (Brennan, J., dissenting). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue which requires trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). As a general rule, the non-movant must respond to a motion for summary judgment with affidavits, or other verified evidence, rather than relying on his complaint or other pleadings. Celotex, 477 U.S. at 324; see also, Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

In the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. Anderson, 477 U.S. at 255. It is well-

---

[1] The Lewises are the only Defendants that filed a Motion for Judgment on the Pleadings instead of a Motion for Summary Judgment. [DE-62]. Pursuant to Fed. R. Civ. P. 12 (c), a party may move for Judgment on the Pleadings after the pleadings are closed, but before the eve of trial. Although procedurally different, both motions share distinct similarities. For example, "[w]hen reviewing a Rule 12(c) motion the court must construe the allegations in the complaint in the light most favorable to the non-moving party. A district court may grant a motion for judgment on the pleadings when no genuine issues of material fact remain and the case can be decided as a matter of law." Hamm v. Canal Ins. Co., 10 F. Supp. 2d 539, 541 (M.D.N.C. 1998). Therefore, the Defendants' Motion will be treated the same as a Motion for Summary Judgment in this case.

4

established that any analysis of the propriety of summary judgment must focus on both the materiality and genuineness of the fact issues. Ross, 759 F.2d at 364. The mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment. Anderson, 477 U.S. at 247-48. A fact is material only when its resolution affects the outcome of the case. Id. at 248. A trial judge faced with a summary judgment motion "must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. The Court is guided by this analysis in the consideration of the Defendants' claims.

## Analysis

### I. State Created Property Rights

On September 29, 1997, the IRS recorded a tax lien against the Longs in the amount of $61,330.64 pursuant to the Federal Tax Lien Act ("FTLA"), 26 U.S.C. § 6321 et. seq. **[DE-64, Ex. A]**. Federal tax liens expire ten years and thirty days after the date of the assessment unless they are timely re-filed; thus, the IRS re-filed its notice of the lien on July 14, 2006 in the principal amount of $52,595.34.[2] See § 6323 (g); **[DE-64, Ex. B]**. The accrued interest on this principal is $69,955.77, for a total of $122,551.11. **[DE-82, Ex. A]**. Section 6321 provides:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

Id.

---

[2] Both tax liens were filed in the Clerk of Superior Court, Bladen County, North Carolina where the taxpayers resided at the time. [DE-64, pgs 5-6]. In addition, the different lien amounts reflect the expiration of the 6/24/1991 assessment and a reduction in the other liens. [DE-64, Exs. A-B].

"[I]n all cases where the Federal Government asserts its tax lien . . . [the court must first determine] to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach." Aquilino v. United States, 363 U.S. 509, 512 (1960). Notably, § 6321 does not create property rights "but merely attaches consequences, federally defined, to rights created under state law . . . .'" Id. at 513 (quoting United States v. Bess, 357 U.S. 51, 55 (1958)). Therefore, "once the tax lien has attached to the taxpayer's state-created interests, . . . federal law . . . determines the priority of competing liens asserted against the taxpayer's 'property' or 'rights to property.'" Aquilino, 363 U.S. at 513-14.

In this case, the central question is whether the hazard insurance proceeds constitute "property" or "rights to property" to which the IRS's lien can attach. Under North Carolina law, "the definition of 'personal property'. . . embraces 'choses in action . . . .'" Wachovia Bank & Trust Co. v. Wolfe, 91 S.E.2d 246, 251 (N.C. 1956) (citing N.C. Gen. Stat. § 12-3 (6)). A "chose in action" is defined as "a personal right not reduced into possession, but recoverable by a suit at law." 63C Am. Jur. 2d Property § 22 (2007); id. ("Choses in action are personal property and, although intangible, are property subject to encumbrances."). Although the term itself is comprehensive, a "chose in action" can include the right to receive contract payments under an insurance policy. Id. at § 23.

On September 12, 2003, Mr. Long obtained hazard insurance for his residence. **[DE-71, p. 3, ¶ 9]**. Mr. Long's insurance policy is considered a bilateral contract between himself and the insurance company. 1-2 North Carolina Contract Law §2-10 (2004). Under the contract, the insurance company, ". . . assumed specified risks and . . . agreed to pay money to the . . . insured upon the happening of certain events." Forsyth County v. Plemmons, 163 S.E.2d 97, 99 (N.C. Ct.

6

App. 1968). The IRS perfected its tax lien against all of the Longs' real and personal property at least six years before Mr. Long obtained hazard insurance. **[DE-64, Ex. A]**. Once the fire destroyed the Longs' residence on March 7, 2004[3], the Longs' rights under the insurance policy ripened into a "chose in action." Because North Carolina law embraces a "chose in action" as personal property, the IRS's lien automatically attached to the insurance policy.

## II.    Priority Among the Defendants

After establishing that the insurance proceeds are a state-created property right to which the IRS's tax lien attached, this Court must look to federal law to determine the priority of the Defendants to receive a portion of the insurance fund. Aquilino, 363 U.S. at 513-14. "Federal tax liens do not automatically have priority over all other liens. Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that 'the first in time is the first in right.'" United States by & Through IRS v. McDermott, 507 U.S. 447, 449 (1993) (quoting United States v. New Britain, 347 U.S. 81, 85 (1954)). Thus, the determination of the priority of state-created liens, "depend[s] on the time [the lien] attached to the property in question and became choate." New Britain, 347 U.S. at 86. A lien is considered "perfected" or "choate" when there is nothing more to be done; specifically when, (1) the identity of the lienor; (2) the property subject to the lien; and (3) the amount of the lien are all well established. Id. at 84; see also, McDermott, 507 U.S. at 449.

Once the IRS filed notice of its lien on September 29, 1997, it acquired a perfected lien in all of the Longs' real and personal property. §§ 6321, and 6323. As a result, the IRS is entitled to priority over all of the Defendants based on the "first in time" rule except for the attorneys who were

---

[3] It should be noted that several different dates are given for when the fire occurred, however, none of the dates will effect the outcome of the case.

responsible for procuring the insurance fund. The arguments for each of the Defendants' claims will be addressed below.

## A. Attorney's Lien

Within months of the fire that destroyed their home in March 2004, Mr. Long hired attorney Thomas S. Hicks and Mrs. Long hired attorney John A. High to represent them in their claim against the NCJUA. **[DE-71, p. 4, ¶ 16 & DE-70-3** ]. Both attorneys contend that because of their efforts, the NCJUA reversed its decision to void the underlying insurance policy, which created the insurance proceeds at issue. **[DE-66, p. 21**, **DE-76-2, p. 7]**. As a result, they now assert that they have priority over the IRS's tax lien based on the attorneys' lien exception in 26 U.S.C. § 6323 (b)(8).

"Congress has given 'superpriority' to . . . attorneys' liens on judgments, such that they trump a federal tax lien even when they arise and become choate after the tax is assessed." Montavon v. United States, 864 F. Supp. 519, 522 (E.D. Va. 1994) (citing § 6323(b)(8)). Specifically, § 6323(b)(8) provides that a federal tax lien will not be valid:

> With respect to a judgment or other amount in settlement of a claim or of a cause of action, as against an attorney who, under local law, holds a lien upon or a contract enforceable against such judgment or amount, to the extent of his reasonable compensation for obtaining such judgment or procuring such settlement . . . .

Id.

The purpose behind this exception is evident. "Without superpriority, an attorney would have less incentive to represent a client subject to an unsatisfied tax lien, for even if the client had a valid claim and eventually recovered a judgment [or settlement], the IRS would take the entire amount under its lien, leaving the attorney with nothing for her efforts." Montavon, 864 F. Supp. at 523.

8

Thus, even if a federal tax lien is "first in time," and has been previously recorded, it will be subordinate to attorneys' liens that meet the requirements of § 6323 (b)(8).

In this case, both attorneys satisfy the requirements under § 6323 (b)(8) because they have a charging lien against the insurance proceeds. "[A] charging lien is an equitable lien which gives an attorney the right to recover his fees from a fund recovered by his aid. The charging lien attaches not to the cause of action, but to the judgment [or settlement] at the time it is rendered." Howell v. Howell, 365 S.E.2d 181, 183 (N.C. Ct. App. 1988) (internal citation omitted). Therefore, both attorneys' liens have priority over the IRS's lien.

Although the IRS concedes the attorneys' priority to its tax lien, it disputes the "reasonableness" of Mrs. Long's contingency fee agreement with Hill & High, which would allow it to recover thirty percent (nearly $40,000) of her interest in the insurance proceeds. **[DE-77, p. 10]**. However, the IRS has not cited any authority that suggests contingency fee agreements are *per se* unreasonable. Id. Instead, it simply alleges that because Hill & High only represented Mrs. Long for one month before procuring the insurance proceeds, the contract is not considered "reasonable compensation" under § 6323 (b)(8). Id. This argument must fail. The "reasonableness" of a contingency fee contract is governed by State law.[4] Rule 1.5 (c) of the North Carolina Rules for Professional Conduct discusses the parameters and requirements for contingency fee contracts. Nothing in this rule casts doubt on the contingency fee agreement at issue. See also, Robinson, Bradshaw & Hinson, P.A. v. Smith, 498 S.E.2d 841, 847 (N.C. Ct. App. 1998) (stating "North

---

[4] Although the IRS failed to cite any authority in support of its argument, at least one federal court has concluded "26 U.S.C. § 6323 (b)(8) protects the attorney to the extent of a reasonable fee, as long as it is protected by local law, for efforts in obtaining and collecting the judgment or amount." Dunn & Black v. United States, 366 F. Supp.2d 1008, 1028 (E.D. Wash. 2005), *vacated, remanded by*, 492 F.3d 1084 (9th Cir. 2007) (emphasis added). Therefore, as long as the attorney's compensation is protected by local law, than the agreement will be upheld.

9

Carolina has approved the use of contingency fee contracts to compensate attorneys except when the fee contract is in direct violation of the public policy of this State.") In addition, the IRS has acknowledged that "there appears to be sufficient insurance proceeds to pay the federal tax liens regardless of the [sic] whether H & H is awarded full contingency (approximately $40,000) or a lesser amount." **[DE-77, p. 11, n.6]**.[5] Accordingly, both attorneys have priority over the IRS's tax liens.

### B.      Deed of Trust

On October 21, 2002, a state court Consent Order ("the Order") stated that Mr. Long was personally indebted to Jeffrey and Ennis Lewis ("the Lewises") in the amount of $58,556.97 together with taxes the Lewises paid on the Long property and interest of 6% on the unpaid balance of the debt. **[DE-65-4]**. To secure the debt, the Order required Mr. Long to execute a deed of trust with the Lewises as beneficiaries. Id.[6] This deed of trust was recorded on July 2, 2003. **[DE-63, p. 4]**. The Lewises now assert a claim in the amount of $81,513.78 against Mr. Long's one-half interest in the insurance proceeds.[7] Id. at 5. They contend that their claim has priority over that of the IRS based on the "first in time" rule in two respects. Id. at 8, 10. First, the Lewises allege that

---

[5] In a footnote, the IRS also addresses Hill & High's alleged contention that their continued legal representation in this interpleader action would fall under the attorneys' lien exception in § 6323(b)(8). [DE-77, p. 10, n.5]; See [DE-66, p. 22]. Hill & High's contingency fee contract was limited to the reversal of the NCJUA's decision, and recovery of the proceeds either by negotiation, settlement, or court action. [DE-66, p. 20]. Thus, their attorney's fee for their effort in procuring the fund is covered by the exception; their continued representation of Mrs. Long is not.

[6] The North Carolina Deed of Trust was executed by Mr. Long for the principal sum of $62, 702.91 on November 7, 2002. [DE-65-6, Ex. A].

[7] The Order stated that the interest on Mr. Long's debt would be 6% from October 21, 2002 until the debt was paid in full. [DE-65-4, p. 2]. The Order also declared that Mr. Long was responsible for "the gross amount of the taxes that Ennis W. Lewis has paid on the said property from the date of the payment until paid at the rate of six (6%) percent." Id. The Lewises claim that no payments have been made on the note and as of November 7, 2007, Mr. Long owes them $81,513.78. [DE-63, p. 5]. In his affidavit, Mr. Long "disputes the amount of the debt, but does not dispute that there is a lien on his property." [DE-71, p. 3, ¶ 8].

the IRS's filing in September 1997 was insufficient to attach to the insurance proceeds.  Id. at 8.

Second, they contend that their claim is superior because of their perfected deed of trust and

equitable lien against

the insurance policy.  Id. at 10.  For the reasons stated below, the undersigned concludes that these

arguments are without merit.

### 1.     Filing Requirements for Personal Property

The Lewises' deed of trust is considered a "security interest" as defined by § 6323 (h)(1) of

the FTLA.  The definition of a "security interest" encompasses "any interest in property acquired

by contract for the purpose of securing payment or performance of an obligation . . . ."  Id.  This

interest only exists when "it is perfected under local law and only 'to the extent that . . . the holder

[of the purported security interest] has parted with money or money's worth'" United States v. 3809

Crain Ltd. P'ship, 884 F.2d 138, 142 (4th Cir. 1989) (citing § 6323(h)(1)).  It is undisputed that the

Lewises' deed of trust was perfected under North Carolina law on July 2, 2003[8], and that they parted

with "money or money's worth" evidenced by Mr. Long's antecedent debt in the amount of

$62,702.91.[9]  Therefore, their "security interest" is protected by the filing requirements of the FTLA.

In order for the lien "imposed by section 6321 to be valid as against any purchaser, holder

of a security interest, mechanic's lienor, or judgment lien creditor," the IRS must file notice of the

lien pursuant to subsection (f). §6323(a).  Subsection (f)(1) mandates that the IRS file notice of its

lien according to the laws of the State where the property is located.  North Carolina's Uniform

---

[8]  A deed of trust is perfected by filing in the Office of the County Register of Deeds.  N.C. Gen. Stat. § 47-20 (LexisNexis 2007).  "On [July 2, 2003,] a deed of trust was executed by Dwight C. Long, a separated person to Alan I. Maynard, Trustee for the Lewises was recorded in Book 522, page 131 of the Bladen County Registry . . . ." [DE-63, P. 4]; [DE-65-6].

[9]  See [DE-65-6, Ex. A].

Federal Lien Registration Act requires that notices of federal liens for personal property be filed in the county where the taxpayer resides. N.C. Gen. Stat. § 44-68.12 (c)(2) (2007). The Internal Revenue Code deems the taxpayer's personal property to be situated at the taxpayer's residence at the time the notice of the lien is filed. In re Eschenbach, No. 00-45215-BJH-13, 2001 Bankr. LEXIS 1216, *at 4 (Bankr. N.D. Tex. Sept. 14, 2001) (citing §6323(f)(2)(B)).

While the IRS properly filed notice of its 1997 lien in Bladen County, North Carolina where the Longs then resided, **[DE-64, Ex. A]** the Lewises claim that under § 6323, "the insurance proceeds have never been located at the residence of the taxpayers;" therefore, the IRS's lien did not attach to the proceeds until it filed notice of its levy on November 30, 2005. **[DE-63, p. 8].** This argument misinterprets the notice provisions of the FTLA. Once the IRS filed notice of its lien based on the requirements of North Carolina's Uniform Federal Lien Registration Act, the lien attached to all of the Longs' personal property everywhere, not just the property that was located at their residence. See In re Eschenbach, 2001 Bankr. LEXIS, *at 6. As a result, the IRS's lien was fully perfected on September 29, 1997 and remains attached to all of the Longs' personal property until their tax liability is extinguished.[10]

### 2. Perfected Deed of Trust

The Lewises next allege that because they have a perfected security interest through their deed of trust, they have priority over the IRS's lien based on the exception under § 6323 (b)(1)(B).

---

[10] The Lewises, and the other claimants, wrongly conclude that the IRS's lien did not attach to the proceeds until the levy on November 30, 2005. [DE-63, p. 8]; [DE-75-2, pgs. 7-8]. However, "[a] levy is merely one instrument with which the United States can enforce a lien. The Supreme Court has determined that the relevant date for determining priority of a federal lien is the date of notice of the *lien*, not the levy." Safemasters Co. v. D'Annunzio & Circosta, No. K-93-3883, 1994 U.S. Dist. LEXIS 10560, *at 12 (D. Md. July 18, 1994) (citing McDermott, 507 U.S. 447) (emphasis in the original). Therefore, the date for determining the IRS's priority is September 29, 1997 when it filed its lien; not November 30, 2005 when it gave notice of its levy.

12

**[DE-63, p. 12]**. However, the Lewises' citation of § 6323 (b)(1)(B) ignores the plain language of the statute. Section §6323(b)(1)(B) provides:

> (b) Protection for certain interests even though notice filed. Even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid–
>
> (1) Securities. With respect to a security (as defined in subsection (h)(4)) –
>
> (B) as against a holder of a security interest in such security who, at the time the interest came into existence, did not have actual notice or knowledge of the existence of such lien.

Id.

Under § 6323(h)(4) a "security" is defined as:

> any bond, debenture, note, or certificate or other evidence of indebtedness, issued by a corporation or a IRS or political subdivision thereof, with interest coupons or in registered form, share of stock, voting trust certificate, or any certificate of interest or participating in, certificate of deposit for receipt for, temporary or interim certificate for, or warrant or right to subscribe to or purchase, any of the foregoing; negotiable instrument; or money.

Id.

The Lewises' perfected deed of trust does not qualify as a "security" as defined by the FTLA and they have cited no authority to prove that it does. Instead, their deed of trust is considered a "security interest," as discussed <u>supra</u> Section II, C, 1. Security interests are protected by the filing requirement under § 6323 (a). This Court has already concluded that the IRS has priority over the Lewises' security interest because it filed notice of its lien before the interest existed. <u>see</u> <u>supra</u> Section II, C, 1. Therefore, this argument is without merit.

### 3. Contractual Equitable Lien

In their final argument, the Lewises allege that they have priority over the IRS based on their equitable lien on the underlying insurance policy. **[DE-63, pgs. 11-12]**. However, the crux of this

argument erroneously assumes that the IRS's lien on the insurance proceeds was not perfected until November 2005. Id. at 8, 12. This Court has already concluded that the September 1997 lien was perfected in and remained attached to all of the Longs' personal property. see supra Section II, C, 1. Therefore, this argument is without merit.

Although the Lewises' equitable lien will not defeat the IRS's priority, discussion of the lien is relevant to their priority over ILS's contractual assignment. Specifically, under the terms of the deed of trust, Mr. Long was required to "purchase and maintain insurance on his one-half undivided interest in the real estate for the benefit of the debt held by the Lewises." **[DE-63, pgs. 10-11]**. However, although Mr. Long "purchased and maintained" insurance on his property, he failed to list the Lewises as the "loss payees" on the policy contract. Id. at 11. The Lewises now assert that they have an equitable lien on the insurance proceeds.

The general rule is that unless a mortgagee is named as the "loss payee" in a fire insurance policy contract, it will have no right to receive the insurance proceeds under that contract.[11] In re Moore, 54 B.R. 781, 783 (Bankr. E.D.N.C. 1985); see also, Wayne Nat'l Bank v. Nat'l Bank, 147 S.E. 691, 692 (N.C. 1929). However, "where the mortgagor is charged with the duty of taking out insurance for the benefit of the mortgagee, as between the parties to the contract the mortgagee is entitled to an equitable lien on the proceeds of the policy obtained by the mortgagor." Wayne Nat'l Bank, 147 S.E. at 692**.** In addition, principles of equity will reform the terms of the contract to "treat the mortgagor as holding the policy in trust for the mortgagee." Fitts v. A.F Messick Grocery Co., 57 .S.E. 164, 167 (N.C. 1907). Reformation of the contract allows the mortgagee to receive the

---

[11] North Carolina is a title theory state, which means that "mortgages normally take the form of deeds of trust." 1-13 Webster's Real Estate Law in North Carolina § 13-1 (2006). Therefore, although deeds of trust use different terms (i.e. grantor, trustee, and beneficiary instead of mortgagor and mortgagee), they are practically the same as mortgages, which means the same rule applies.

insurance proceeds to the extent of the mortgagor's debt. 44A Am. Jur. 2d Insurance § 1704 (2007); see also, Wayne Nat'l Bank, 147 S.E. at 693 (stating that "[t]he insurance money received by the mortgagee takes the place of the mortgaged property, and the mortgagee would receive it, if the debt was due and unpaid, as he would receive the mortgaged property which it represented to reasonably account for its use").

Because the deed of trust required Mr. Long to insure his property for the benefit of the Lewises, his failure to do so created an equitable lien on the insurance proceeds. However, ILS asserts that it has priority over the Lewises' claim because it has a perfected "ownership interest" in the proceeds that arose prior to the Lewises' "inchoate equitable lien." **[DE-69, pgs. 8-10]**. This argument must fail for two reasons. First, contrary to ILS's assertion, Mr. Long's contractual assignment of the insurance proceeds created an equitable lien in favor of ILS, not an "ownership interest." See 51 Am. Jur. 2d Liens § 40 (2007) (indicating that an agreement to assign property that a party does not yet own creates an equitable lien on the assignment contract). In addition, this was ILS's position in its motion: "[t]he contract that assigned the proceeds of the insurance policy to International Loss Services, Ltd., was sufficient to create an equitable lien to the extent of the fee earned by the public adjuster." **[DE-75-2, p. 6]** (emphasis added)**.**

Second, although both the Lewises and ILS have an equitable lien on the insurance proceeds, "such a lien relates back, for priority purposes, to the time it was created by the conduct of the parties." 51 Am. Jur. 2d Liens § 72 (2007). In this case, equity reformed the insurance contract to include the Lewises on the loss payable clause at the time the contract was made on September 12, 2003. **[DE-71, p. 3]**. Therefore, the Lewises had an equitable lien on the proceeds several months

before Mr. Long agreed to the assignment with ILS on March 20, 2004. see supra Section II, B, 3. Accordingly, the Lewises' equitable lien is superior to ILS's contractual assignment.

## C.    International Loss Services

On March 20, 2004, Mr. Long hired ILS to assist him in preparing his claim against NCJUA. **[DE-69, p. 4]**. Their written contract stipulated that ILS would receive "twelve percent (12%) of the loss payable, which sum is equivalent to $28,560.00." Id. ILS now claims that it has priority over the IRS's tax lien based on three legal theories.[12] Id. at 5. Each is addressed below:

### 1.    Assessment of Taxes

First, ILS contends that the IRS failed to timely assess the Longs' taxes for certain time periods according to the requirements of 26 U.S.C. § 6501(a).[13] **[DE-69, pgs. 5-6]**. Specifically, ILS argues that "[t]here has been no showing that Defendants Dwight and Kathy Long did not file a tax return for the periods addressed in the lien, thus Int'l Loss asserts the Court must assume that a tax return was timely filed for these periods." **[DE-69, p. 5]**. Based on this reasoning, ILS concludes that the IRS's tax lien against the insurance proceeds is unenforceable. **[DE-69, pg. 6]**.

Section 6501(a) provides that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed . . . ." In support of its motion, the IRS submitted an affidavit from Ralph Thompson, an Advisor with the Internal Revenue Service in their Greensboro, North Carolina Office. **[DE-77, Ex. B, p. 1]**. In his affidavit, Mr. Thompson affirms that he is familiar

---

[12] ILS filed four Motions for Summary Judgment. [DE-69, 70, 75, 76]. The arguments in each motion have been consolidated and addressed above.

[13] The IRS questions ILS's standing to challenge the validity and timeliness of the tax assessments against the Longs. [DE-77, p. 12, n.8]. Because the IRS's lien will be fully satisfied based on its priority, the Court will not address this issue.

with the facts of this case and has reviewed the Longs' tax records and transcripts for the relevant time periods. Id. Based on his review, Mr. Thompson stated that the Longs' tax returns for the tax years 1990, 1991, 1992, and 1994 were not received by the IRS until August 2, 1996. **[DE-77, Ex. B, p. 1].** The demand for payment and notice of assessment for these years was made on December 2, 1996, 4 months after the date of which the Longs filed their taxes. Id. In addition, Mr. Thompson also affirmed that the Longs' tax return for 1993 was not received until August 9, 1994. Id. at 2. The demand for payment and notice of assessment for this year was made on February 3, 1997, which is 2 years and 6 months after the date of which the Longs filed their taxes. Id. Based on this evidence, it is the clear that the IRS timely filed its notices of assessment against the Longs. Thus, the ILS's argument must fail.

### 2. IRS Liens Released

ILS next alleges that the IRS's tax lien for the years 1989 through 1994 have been released because of its failure to timely re-file the lien by the stipulated deadlines. **[DE-69, pgs. 6-7].** See the chart below[14]:

| Tax Year | Assessment Date | Refile Deadline |
|----------|-----------------|-----------------|
| 12/31/1989 | 06/24/1991 | 07/24/2001 |
| 12/31/1990 | 12/02/1996 | 01/01/2007 |
| 12/31/1991 | 12/26/1996 | 01/25/2007 |
| 12/31/1992 | 12/02/1996 | 01/01/2007 |
| 12/31/1993 | 02/03/1997 | 03/05/2007 |
| 12/31/1994 | 09/30/1996 | 10/30/2006 |

---

[14] Chart was compiled from [DE-64, Ex. A].

17

However, the IRS timely re-filed its liens for the tax years 1990-1994 on July 14, 2006.[15] See **[DE-64, Ex. B]**. Therefore, this argument is without merit.

### 3. IRS Liens for 1995-2003

Finally, ILS argues that the IRS's liens for the years 1995 through 2003 were not docketed until after Mr. Long assigned his rights to the insurance proceeds to ILS. However, the IRS has already conceded this argument. **[DE-77, p. 13]**. As a result, this argument will not be addressed further.

ILS makes a corollary argument that it has priority over the other Defendants based on the doctrine of unjust enrichment. **[DE-69, pgs. 12-13]**. Specifically, ILS contends that but for their efforts, there would be no insurance proceeds to which the other Defendants' liens could attach. Id. at 13. "Where one person has officiously conferred a benefit upon another, the other is enriched but is not considered to be unjustly enriched. The recipient of a benefit voluntarily bestowed without solicitation or inducement is not liable for their value." Rhyne v. Sheppard, 32 S.E.2d 316, 318 (N.C. 1944). In this case, the other Defendants did not contract for ILS's services, the Longs did. As a result, although the Defendants indirectly received the benefit of ILS's services, they were not unjustly enriched and are entitled to their priority in the insurance funds.

## III. Distribution of the Insurance Proceeds

In addition to determining the priority among the Defendants, the Court must also decide how the funds should be distributed. Specifically, Defendant Kathy Long asserts several arguments as to why her share of the insurance proceeds should not be reduced by the claims of the other

---

[15] The deadline for the 1989 tax assessment did expire, but "the IRS has made no effort to secure payment under the 1989 assessed taxes" evidenced by the reduction of the lien. [DE-77, p. 13, n.10]; See [DE-64, Ex. A]

Defendants. **[DE-66, pgs 9-19]**. For example, with regards to the IRS's lien, she alleges that the amount of the lien should not be deducted from her portion of the proceeds for two reasons. First, she claims that the IRS failed to properly refile its notice of its lien based on her change in residency. Second, she contends that a state court consent judgment (hereinafter "judgment") already determined that her ex-husband, Dwight C. Long, was responsible for payment of the delinquent taxes. **[DE-66, pgs . 9-16]**. In addition, Mrs. Long also disclaims financial responsibility for the services performed by ILS. **[DE-66, p. 4]**. For the reasons stated below, the undersigned concludes that these arguments are without merit.

       1.      **Tax Liability**

       a.      **Change in Residence**

Mrs. Long contends that her rights to the insurance proceeds did not arise until after the fire occurred on March 4, 2004, during which time she had moved from Bladen County, North Carolina to Robeson County, North Carolina. **[DE-66, p.16 & DE-65, Ex. N]**. As a result, she now asserts that because the IRS refiled the notice of its lien in Bladen County on July 14, 2006, the lien was not perfected in her share of the proceeds since she no longer resided in that county. **[DE-66, pgs. 15-16]**.[16]

This Court concluded that on September 29, 1997, the IRS properly filed notice of its lien on all of the Longs' personal property in accordance with North Carolina's Uniform Federal Lien Registration Act. see supra Section II, C, 1. "[O]nce properly filed, the lien . . . remains valid even

---

[16] Mrs. Long also argues that the assessment for the 1989 tax year was released because the IRS failed to timely refile notice of its lien. [DE-66, P. 15]. However, the IRS has already conceded this argument by explicitly stating that it is not seeking to recover the delinquent taxes for the 1989 assessment. [DE-77, p. 9].

if the debtor leaves the residence." In re Eschenbach, 2001 Bankr. LEXIS, at 6. This result comports with the purpose behind the Internal Revenue Code.

> The Internal Revenue Code does not require the IRS to file a tax lien in every county to which a taxpayer could carry personal property. 'To hold otherwise, would be to overlook the practical necessities of the situation and would require the Collector to file tax liens in every jurisdiction to which the taxpayers may at any time remove the property.' Similarly, by providing that the lien attaches to all property 'belonging to' the taxpayer, for the period until paid, with the property deemed situated at the taxpayer's residence at the time the notice of lien is filed, the Internal Revenue Code eliminates any need for the IRS to file tax liens in every jurisdiction to which a taxpayer may move and acquire new property.

In re Eschenbach, 2001 Bankr. LEXIS at 7-8 (internal citations omitted).

Therefore, because the IRS was not required to refile its tax lien based on Mrs. Long's change in residence, its lien remained perfected in and attached to all of her personal property.[17]

### b.    State Court Judgment

Mrs. Long next alleges that a state court consent judgment has already determined that Mr. Long is responsible for the payment of the delinquent taxes. **[DE-66, p.18]**; **[DE-65-4]**. Specifically, Mrs. Long cites language from the judgment that states "Dwight C. Long and Kathy Y. Long shall each be responsible for their individual income tax liabilities, both with the State of North Carolina and the Internal Revenue Service and shall hold the other party harmless from the same." **[DE-65, Ex. C, p. 3]**. She believes that because Mr. Long's social security number is listed as the identifying number on the notices of the federal tax liens, she is not liable. **[DE-66, p. 18]**. To that end, she concludes that this Court is precluded from deciding this issue based on the doctrine of collateral estoppel. **[DE-66, pgs. 17-19]**.

---

[17] In addition, to the extent that Mrs. Long alleges that "no demand was actually made by the Internal Revenue Service," for the delinquent and thus "there is no lien in favor of the United States,"[DE-66, p. 13] this argument is without merit. Mr. Thompson's affidavit affirms the dates when notices and demands for payment were sent to the Longs. see supra Section II, C, 1; [DE-77, Ex. B].

"[C]ollateral estoppel . . . bars relitigation of issues that in the prior action were actually litigated, squarely addressed, and specifically decided." 47 Am. Jur. 2d Judgments § 493 (2007).[18] This doctrine only applies where there is a second action between the same individuals who were parties to the original action. Id. at § 491. In this case, none of these elements apply.

First, it should be noted that the IRS was not a party to the state court judgment, which means it is not bound that decision. See In re Cooper, 83 B.R. 544, 545 n.1 (Bankr. C.D. Ill. 1988) (noting that because the IRS was not a party to the spousal separation agreement that obligated one spouse to pay the delinquent taxes, it was free to go after either spouse or both for the unpaid taxes). Second, the state court did not have the authority to determine or alter the nature and extent of the Longs' federal tax liability. See Ridgeway v. Ridgeway, 546 U.S. 46, 55 (holding that the Supremacy Clause requires "state divorce decree[s] [to] . . . give way to clearly conflicting federal enactments"). Third, Mrs. Long incorrectly concludes that because the "identifying number" on the notice of the liens listed Mr. Long's social security number, she is not liable. **[DE-66, p. 18]**. However, for the relevant tax years at issue, the Longs filed joint tax returns, which means that both spouses are jointly and severally liable for the delinquent tax liens. **[DE-79, p. 2]**; See 26 U.S.C. § 6013 (d)(3) (stating "if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several"). In addition, listing Mr. Long's social security number is not dispositive evidence of Mrs. Long's liability because "it is the routine practice of the IRS to use the social security of only one spouse on the Federal tax lien notices." **[DE-79, p. 3]; [DE-79-2]**.

---

[18] An issue is "actually litigated" when it is properly raised in the pleadings or otherwise submitted for determination and in fact determined. Id. at § 494.

Furthermore, notwithstanding the above, this Court's jurisdiction is limited to determining the priority of the interpleaded Defendants and ordering the disposition of the insurance proceeds; not assessing the Longs' tax liability. See State Farm Fire & Cas. Co. v. Click, No. 3:92-0917, 1994 U.S. Dist. LEXIS 18518, *at 3 (S.D. W. Va. Dec. 8, 1994) (holding that the taxpayer defendant could not use the interpleader action to collaterally attack the amount of his tax assessment). Therefore, even though Mrs. Long disputes her responsibility to pay the IRS's lien, she must "pay first and litigate later." Id. at 4. Accordingly, the IRS's lien will deducted equally from the Longs' interests in the insurance proceeds.

### 2. Financial responsibility for services performed by ILS

In addition to disputing her liability for the IRS's lien, Mrs. Long also contends that she was never a party to the contract with ILS; thereby disclaiming financial responsibility for their services. **[DE-66, p. 4]**.[19] However, in an affidavit from Mr. Long, he affirms that Mrs. Long ratified the contract by "communicat[ing] her agreement for International Loss Services to collect its fee and perform the public adjusting work on the fire loss in a letter from her attorney James E. Hill, Jr. . . . ." **[Affidavit of Dwight C. Long, p. 5, ¶ 17].**[20] Mr. Long is correct.

In a letter dated August 17, 2004, Mrs. Long's attorney, James E. Hill, explicitly stated:

> Ms. Long will pay for all reasonable out of pocket to Loss Services of Wilmington for the clean up expenses which are incurred and actually paid directly through the courthouse or Loss Services to the third party. In addition, she agrees to pay Loss of Services a fee of twelve (12%) percent of all payments on their behalf as contracted.

---

[19] ILS has requested 12% of the insurance proceeds for the work it performed, which is $28,560. [DE-73, Ex. 14].

[20] In addition, in his motion for summary judgment Mr. Long argues, "[a]lthough Kathy Long was not a party to the contract [with ILS], the latter ratified same and agreed to payment being made." [DE-76-2, p. 6].

**[DE-73, Ex. 9]**.

The general rule is that even though an individual is not a party to a contract, they can become liable on a contract through the creation of an agency relationship. An agency relationship is created when a principal manifests his or her consent that an agent act on his or her behalf and be subject to his or her control. 3 Am. Jur. 2d Agency § 1 (2007). "The attorney-client relationship is based upon principles of agency;"the client is the principal, and the attorney is the agent. <u>Harris v. Ray Johnson Constr. Co.</u>, 534 S.E.2d 653, 655 (N.C. Ct. App. 2000). As a result, a client will be held liable on a contract made by her attorney with a third person when "(1) the [attorney] acts within the scope of his actual authority; (2) when the contract, although unauthorized, has been ratified, [and] (3) when the [attorney] acts within the scope of his apparent authority . . . ." <u>Inv. Prop. of Asheville, Inc. v. Allen</u>, 196 S.E.2d 262, 267 (N.C. 1973).

Actual authority is authority that an attorney reasonably believes he possesses. <u>Harris</u>, 534 S.E.2d at 655. This authority can be implied from the words or conduct of the client as well as the particular circumstances of the attorney-client relationship. <u>Id.</u> On the other hand, ratification occurs when the client adopts his attorney's actions, or accepts the benefits of his attorney's efforts, even though the attorney lacked the authority to act. <u>Trollinger v. Fleer</u>, 72 S.E. 795, 797-98 (N.C. 1911); <u>see also</u>, <u>Hooper v. Merchant's Bank & Trust Co.</u>, 130 S.E. 49, 52 (N.C. 1925) (stating "[r]atification is based upon the plain principle of honesty that a party cannot retain the benefits and escape the burdens of an act done by an unauthorized agent"). Both principles affirm the presumption in North Carolina that in general, an attorney has the authority to act for the client he professes to represent. <u>Harris</u>, 534 S.E.2d at 654.

23

In this case, Mr. Hill was acting as Mrs. Long's agent when he wrote the letter to Mr. Long's attorney, thus, it is reasonable to assume that Mr. Hill was acting within the scope of his actual authority. However, even if Mr. Hill exceeded his authority, Mrs. Long has not provided any evidence to rebut the presumption that Mr. Hill had the authority to bind her to the ILS contract. See Harris, 534 S.E.2d at 655 (holding "[o]ne who challenges the actions of an attorney as being unauthorized has the burden of rebutting [the] presumption and proving lack of authority to the satisfaction of the court"). Instead, she simply argues that she should receive the benefit of ILS's services, which was partly responsible in procuring the insurance proceeds, but not the burden paying their fee. This argument must fail. Mr. Hill's letter effectively bound Mrs. Long to the terms of the ILS contract. In addition, when two or more people undertake a joint obligation, it is considered a joint contract. 17A Am. Jur. 2d Contracts § 421 (2007). "Under N.C. Gen. Stat. § 1-72 ([2007)], joint obligors on a contract are jointly and severally liable." McInnis & Assoc., Inc. v. Hall, 333 S.E.2d 544, 546 (N.C. Ct. App. 1985), *aff'd in part, rev'd in part*, 349 S.E.2d 552 (N.C. 1986); see also, Rufty v. Claywell, Powell & Co., 93 N.C. 306, 308 (N.C. 1885). As a result, because the Longs agreed to be jointly responsible for the ILS contract, if Mr. Long cannot pay his portion, Mrs. Long is jointly and severally liable for the unpaid balance.[21] Accordingly, ILS is entitled to receive its fee from Mrs. Long's share of the insurance proceeds subject to the claims of the other Defendants.

---

[21] While ILS contests Mrs. Long's right to receive the portion of the insurance proceeds that covered the personal property destroyed by the fire, they do so solely to establish the priority of their fee. [DE-69, pgs. 11-12]; see also, [DE-66, pgs. 8-9] (Mrs. Long argues that she and her ex-husband own all of the insurance proceeds as tenants in common since they owned the residential property as tenants in common; thus they are both entitled to $119,000). However, Mr. Long, who presumably owned most of the personal property, has not raised any similar objections and the Court will interpose any for him. Accordingly, the insurance proceeds will be divided equally between the Longs; both are entitled to $119,000 subject to the claims of the other Defendants.

In conclusion, the Longs are entitled to an equal share of the insurance proceeds; $119,000 each. However, the insurance proceeds will be distributed based on the claimants' priority as determined above:

1) Thomas S. Hicks will receive $5,150.03 from Mr. Long for his legal services and Hill & High L.L.P. will receive $39,666.66 from Mrs. Long for its legal services. **[DE-70-3, p. 3, ¶ 11]**; **[DE-66, p. 25]**.

2) The IRS will receive $122,551.11 for its tax lien plus accrued interest, which will be deducted equally from the Longs' portions of the proceeds ($61, 275.55 each). **[DE-64, p. 7 & DE-77, p. 14, DE-82, pgs. 1-2]**.

3) The Lewises will receive $52,574.42 for their equitable lien from the remaining portion of Mr. Long's interest in the insurance proceeds. **[DE-63, p. 5]**. This will exhaust the insurance proceeds payable to Mr. Long.

4) ILS will receive $18,057.79 for its equitable lien from the remaining portion of Mrs. Long's interest in the insurance proceeds. This will exhaust the insurance proceeds payable to Mrs. Long.

**Conclusion**

The Internal Revenue Service's Motion for Partial Summary Judgment **[DE-64 & 77]** is GRANTED, the Lewises Motion for Judgment on the Pleadings **[DE-62]** is DENIED in part and GRANTED in part, Kathy Y. Long's and Hill & High's Motion for Summary Judgment **[DE-65]** is DENIED in part and GRANTED in part, International Loss Services' Motion for Summary Judgment **[DE-67]**, is DENIED in part and GRANTED in part, and International Loss Services', Thomas S. Hicks', and Dwight C. Long's Motions for Summary Judgment **[DE-70, 75, & 76 ]** are DENIED in part and GRANTED in part.  The Clerk is directed to close this case.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this 31st day of January, 2008.

_____
William A. Webb
U.S. Magistrate Judge